**QUEENS COLLEGE STUDENTS FOR LIFE,** on behalf of its members, and **NORVILIA ETIENNE,**

*Plaintiffs,*

v.

**MEMBERS OF THE CITY UNIVERSITY OF NEW YORK BOARD OF TRUSTEES,** in their official capacities and in their individual capacities; **FELIX V. MATOS RODRIGUEZ,** in his official capacity as President of Queens College and in his individual capacity; **ADAM ROCKMAN,** in his official capacity as Vice President for Student Affairs and in his individual capacity; **JUDY KRINITZ,** in her official capacity as Associate Director of Student Development and Leadership and in her individual capacity; **SEVERINO RANDAZZO,** former Student Development and Leadership Coordinator in his individual capacity; **JESSICA SHAMASH,** in her official capacity as Chairman of Campus Affairs Committee and in her individual capacity; **MARCO SIN,** in his official capacity as member of the Campus Affairs Committee and in his individual capacity; **RAVEEN KANAGARATNAM,** in his official capacity as member of the Campus Affairs Committee and in his individual capacity,

*Defendants.*

Case No. 1:17-cv-402

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Queens College Students for Life and Norvilia Etienne, by and through counsel, and for their Complaint against Defendants hereby state as follows:

## INTRODUCTION

1. Public universities are supposed to be a "marketplace of ideas," where the young adults that are tomorrow's leaders are exposed to differing opinions and learn how the Constitution protects both their own rights and those of their classmates with whom they disagree. Queens College is teaching its students that the First Amendment does not apply to some government

1

actors, granting them unbridled discretion to discriminate against student speech because of its pro-life viewpoint and depriving its students of the opportunity to be exposed to differing views.

2.     This is a civil action seeking injunctive and declaratory relief, to vindicate and safeguard Plaintiffs' fundamental rights as secured by the First and Fourteenth Amendments to the United States Constitution.

3.     Queens College ("The College") enforces a policy (the "RSO Policy") for registration of student organizations that affords them access to certain benefits and privileges, including meeting space, channels of communication, and student activity funding unavailable to other unregistered groups. However, Queens College affords unbridled discretion to those officials and students responsible for deciding which groups to approve, allowing Defendants to deny this critical status to any group because Defendants object to the group's views. Indeed, Defendants have employed this RSO Policy to exclude Queens College Students for Life from the opportunities available to all other student groups—refusing even to explain their decision.

4.     Queens College also enforces a policy (the "Student Activity Fee Policy") that compels the members of Plaintiff Queens College Students for Life—including Plaintiff Norvilia Etienne— to pay substantial student activity fees every semester, but excludes Queens College Students for Life from access to funding from those fees and allocates the student activity fees in a manner that favors those viewpoints Defendants wish to promote. As a result, Plaintiffs must fund the speech of groups that support abortion but are denied access to this same funding to share their own opposing message.

5.     Defendants' policies and actions deprive Plaintiffs, and others similarly situated, of their fundamental rights under the United States Constitution.

6.     Each and every action of the Defendants alleged herein was committed by Defendants under the color of state law and authority.

## JURISDICTION & VENUE

7.     This action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988.

8.     This Court has original jurisdiction over the federal claims by operation of 28 U.S.C. §§ 1331 and 1343.

9.     This Court has authority to grant the requested declaratory relief under 28 U.S.C. §§ 2201–2202, the requested injunctive relief under 28 U.S.C. § 1343(a)(3)–(4), the requested damages under 28 U.S.C. § 1343(a)(4), and attorneys' fees under 42 U.S.C. § 1988(b).

10.     Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. § 1391 because the events giving rise to the claims occurred in this District and because at least one Defendant resides in this District.

### PLAINTIFFS

11.     Plaintiff Queens College Students for Life is a student-led, non-partisan, pro-life, unincorporated expressive student organization comprised of Queens College students. It brings this action on behalf of itself and its individual student members.

12.     Plaintiff Queens College Students for Life seeks to become a registered student organization ("RSO") at the College.

13.     Plaintiff Queens College Students for Life seeks to avail itself of the meeting space, speech forums and other benefits and privileges that are available to RSO's at Queens College.

14.     Plaintiff Queens College Students for Life has been denied RSO status at Queens College by Defendants and under policies created and enforced by Defendants.

15.     Miss Etienne and every student member of Plaintiff Queens College Students for Life pays mandatory student fees at the College.

16.     Miss Etienne and every student member of Plaintiff Queens College Students for Life is entitled to viewpoint neutral access to all forums available to RSO's, including access to student activity funding.

17.     Part of Queens College Students for Life's mission is to be an expressive student organization at the College and to protect its members' constitutional rights, including their rights to free speech and association, against compelled speech and funding of abortion advocacy, and to equal access to student organization funding.

18. If Queens College Students for Life succeeds in this lawsuit, it will be able to obtain viewpoint neutral access to RSO status and to all benefits and privileges available to such groups, including meeting space, access to channels of communication and viewpoint neutral access to student activity fee funding.

19. Plaintiff Norvilia Etienne is, and at all times relevant to this Complaint was, the President of Queens College Students for Life and a full-time enrolled student at Queens College.

20. Miss Etienne compiled and submitted the required documentation to permit Queens College Students for Life to become an RSO and made the required presentation to the Defendants identified below who comprised the Campus Affairs Committee and who denied this application.

21. Miss Etienne has repeatedly contacted Defendants concerning the decision to deny RSO status to Queens College Students for Life, receiving no explanation as to why the group has been denied recognition.

22. Miss Etienne pays mandatory student fees at the College and has paid this fee every semester she has been enrolled. Miss Etienne and each full-time enrolled student member of Plaintiff Queens College Students for Life, pays mandatory fees of $303.85 each semester, of which $162.40 is charged as a Student Activity Fee.

23. Mandatory student fees paid by Miss Etienne and members of Queens College Students for Life have been and will be allocated to student groups for causes to which they object, including advocacy for the right to abortion and against their own pro-life views.

24. Miss Etienne and members of Queens College Students for Life are entitled to the viewpoint neutral distribution of the mandatory student fees they have been and will be required to pay or to the repayment of fees they have paid. In addition, they cannot constitutionally be compelled to pay into a viewpoint discriminatory student organization funding system.

## DEFENDANTS

25. Defendant Members of the Board of Trustees of the City University of New York (hereinafter "Board Defendants") are, and were at all times relevant to this Complaint, the members of the Board of Trustees of the City University of New York, a public university

organized and existing under the laws of the State of New York and the City of New York.

26. The Board Defendants are William C. Thompson, Jr.; Barry F. Schwartz; Wellington Z. Chen; Una S. T-Clarke; Lorraine Cortes-Vazquez; Rita DiMartino; Fernando Ferrer; Judah Gribetz; Mayra Linares-Garcia; Robert F. Mujica; Brian D. Obergefell; Jill O'Donnell-Tormey; Charles A. Shorter; Ken Sunshine; Sandra Wilkin; Chika Onyejiukwa; and Katherine M. Conway.

27. The Board Defendants are responsible for the adoption and authorization of policies that govern students and student organizations at the College, including the RSO Policy and Student Activity Fee Policy and their application to Plaintiffs.

28. The Board Defendants are responsible for enactment, amendment and repeal of Board of Trustees policies applicable to students and student organizations, including the RSO Policy, and policies that govern collection and allocation of mandatory student fees at the College, including the Student Activity Fee Policy, which are challenged as unconstitutional.

29. The Board Defendants acquiesce in, sanction, and support the actions of all Defendants, including the adoption of policies implementing the authority granted by the Board of Trustees Bylaws and the enforcement of the RSO Policy and the Student Activity Fee Policy.

30. The Board Defendants have not instructed or requested that University officials, the other Defendants, or the Queens College Association change or alter the RSO Policy or Student Activity Fee Policy to comply with constitutional requirements.

31. The Board Defendants have enforced the RSO Policy and the Student Activity Fee Policy in an unconstitutional manner because they have permitted University officials, including the other Defendants, from exercising unbridled discretion in enforcing the RSO Policy and the Student Activity Fee Policy.

32. The Board Defendants have responsibility and authority over the College budget and allocation of monies within the College, including the assessment of mandatory student fees and the allocation of student activity fee revenues to student organizations.

33. Each Board Defendant is sued in his or her official and individual capacities.

34. Defendant Felix V. Matos Rodriguez is, and was at all times relevant to this Complaint,

the President of Queens College, a college of the City University of New York, a public university organized and existing under the laws of the State of New York and the City of New York.

35.    Defendant Rodriguez is responsible for enactment, enforcement, administration and policymaking relating to students and student organizations, including the RSO Policy and the Student Activity Funding Policy and practices implementing those policies.

36.    Defendant Rodriguez has responsibility and authority over the college budget and allocation of monies within the college, including the assessment of mandatory student fees and the allocation of student activity fee revenues to student organizations.

37.    As president of the College, Defendant Rodriguez possesses the authority to change and is responsible for enforcement of the RSO Policy and the Student Activity Fee Policy.

38.    Defendant Rodriguez, because of his role as President of Queens College, serves as a member of the Queens College Association Board of Directors.

39.    The Queens College Association Board of Directors, including Defendant Rodriguez, oversees the actions of the Queens College Association, including its responsibility for supervision and review of all student fee supported budgets. The Queens College Association Board of Directors, including Defendant Rodriguez, is charged with the responsibility to review the allocation of student activity fees to registered student groups and to disallow any allocation or expenditure it finds inappropriate, improper or inequitable.

40.    Defendant Rodriguez, as President, is separately authorized to review any allocation or expenditure of student activity fees to student organizations.

41.    Defendant Rodriguez has not instructed or requested that University officials, the other Defendants, or the Queens College Association change or alter the RSO Policy or Student Activity Fee Policy to comply with constitutional requirements.

42.    Defendant Rodriguez is responsible for all policies and actions of the Queens College Office of Student Development and Leadership and for creating, reviewing, changing, authorizing, and enforcing the policies or practices of that office, including the RSO Policy and the Student Activity Fee Policy and practices implementing those policies.

43.     Defendant Rodriguez enforces the RSO Policy in an unconstitutional manner because he permits University officials, including CAC Defendants, to exercise unbridled discretion in implementing the RSO Policy, allowing denials of RSO status that are arbitrary and without justification and that result in viewpoint or content discrimination.

44.     Defendant Rodriguez enforces the Student Activity Fee Policy that requires Miss Etienne and members of Plaintiff Queens College Students for Life to pay mandatory student fees and allows Defendants to exercise unbridled discretion in allocating student activity fees, permitting discrimination against student groups on the basis of the viewpoint and content of their speech.

45.     Defendant Rodriguez is sued in his official and individual capacities.

46.     Defendant Adam Rockman is, and was at all times relevant to this Complaint, Vice President for Student Affairs at Queens College, a public university organized and existing under the laws of the State of New York and the City of New York.

47.     Defendant Rockman is responsible for enactment, enforcement, administration and policymaking relating to students and student organizations, including the RSO Policy and the Student Activity Funding Policy and practices implementing those policies.

48.     Defendant Rockman has the authority to recommend changes to and is responsible for enforcement of the RSO Policy and the Student Activity Fee Policy.

49.     Defendant Rockman is responsible for the administration and application of the RSO Policy and the Student Activity Fee Policy, granting Defendants unbridled discretion to grant or deny registered student organization status in a content- and viewpoint-based manner, and requiring Miss Etienne and the members of Plaintiff Queens College Students for Life to pay mandatory student fees to support advocacy with which they disagree while granting unbridled discretion to distribute those fees in a viewpoint discriminatory manner.

50.     Defendant Rockman is responsible for overseeing the Queens College Office of Student Development and Leadership and for creating, reviewing, changing, authorizing, and enforcing the policies of that office, including those concerning the registration of student organizations and the allocation of student activity fees to student organizations.

51.   Defendant Rockman enforces the RSO Policy in an unconstitutional manner because he permits University officials, including CAC Defendants, to exercise unbridled discretion in implementing the RSO Policy, allowing denials of RSO status that are arbitrary and without justification and that result in viewpoint or content discrimination.

52.   Defendant Rockman enforces the Student Activity Fee Policy that requires Miss Etienne and members of Plaintiff Queens College Students for Life to pay mandatory student fees and allows Defendants to exercise unbridled discretion in allocating student activity fees, permitting discrimination against student groups on the basis of the viewpoint and content of their speech.

53.   Defendant Rockman is sued in his official and individual capacities.

54.   Defendant Judy Krinitiz is, and was at all times relevant to this Complaint, Associate Director of Student Development and Leadership at Queens College, a public university organized and existing under the laws of the State of New York and the City of New York.

55.   Defendant Krinitz is responsible for enactment, enforcement, administration and policymaking relating to students and student organizations, including the RSO Policy and the Student Activity Funding Policy and practices implementing those policies.

56.   Defendant Krinitz has the authority to recommend changes to and is responsible for enforcement of the RSO Policy and the Student Activity Fee Policy.

57.   Defendant Krinitz is responsible for all policies and actions of the Queens College Office of Student Development and Leadership and for creating, reviewing, changing, authorizing, and enforcing the policies of that office, including the RSO Policy and the Student Activity Fee Policy.

58.   Defendant Krinitz enforces the RSO Policy in an unconstitutional manner because she exercises unbridled discretion and permits University officials, including CAC Defendants, to exercise unbridled discretion in implementing the RSO Policy, allowing denials of RSO status that are arbitrary and without justification and that result in viewpoint or content discrimination.

59.   Defendant Krinitz enforces the Student Activity Fee Policy that requires Miss Etienne and members of Plaintiff Queens College Students for Life to pay mandatory student fees and allows for the exercise of unbridled discretion in allocating student activity fees, permitting

discrimination against student groups on the basis of the viewpoint and content of their speech.

60.    Defendant Krinitz, or her designee(s), serve on the Campus Affairs Committee ("CAC"), the entity which determines whether a student organization may receive registered student organization status.

61.    Defendant Krinitz is responsible for policymaking and administration of policies concerning the benefits and privileges available to student organizations and their access to forums for communication at Queens College.

62.    Defendant Krinitz was, at all times relevant to the Complaint, responsible for the supervision of the staff of the Office of Student Leadership and Development, including Defendant Randazzo.

63.    Defendant Krinitz responded to Miss Etienne's inquiries about the status of Plaintiff Queens College Students for Life's application for RSO status. As a result of these inquiries, Defendant Krinitz spoke with the members of the Campus Affairs Committee or Defendant Randazzo. Thereafter, the CAC informed Queens College Students for Life that its application was denied, copying Defendant Krinitz and providing no explanation of the basis for the denial.

64.    Defendant Krinitz and others under her supervision in the Office of Student Leadership and Development have declined to respond to Miss Etienne concerning the reasons for the denial of the group's application for registered student organization status.

65.    The Student Development and Leadership Handbook, including portions of the RSO Policy and the Student Activity Fee Policy, was published under the authority and direction of Defendant Krinitz.

66.    Defendant Krinitz is sued in her official and individual capacities.

67.    Defendant Severino Randazzo was, until subsequent to the decision to deny Queens College Students for Life recognition under the RSO Policy in November 2016, Student Development and Leadership Coordinator at Queens College, a public university organized and existing under the laws of the State of New York and the City of New York.

68.    Defendant Randazzo was responsible for the administration of policies under the

9

authority of the Office of Student Development and Leadership at the College, including the RSO Policy and the Student Activity Fee Policy.

69.    Defendant Randazzo had the authority to recommend changes to and was responsible for enforcement of the RSO Policy and the Student Activity Fee Policy.

70.    Defendant Randazzo enforced the RSO Policy in an unconstitutional manner because he exercised and permitted other Defendants, including the other CAC Defendants, to exercise unbridled discretion in implementing the RSO Policy, allowing denials of RSO status that are arbitrary and without justification and that result in viewpoint or content discrimination.

71.    Defendant Randazzo enforced the Student Activity Fee Policy that requires Miss Etienne and members of Plaintiff Queens College Students for Life to pay mandatory student fees and allows for the exercise of unbridled discretion in allocating student activity fees, permitting discrimination against student groups on the basis of the viewpoint and content of their speech.

72.    Defendant Randazzo was the staff member in the Office of Student Development and Leadership who communicated with Miss Etienne concerning Plaintiff Queens College Students for Life's application for RSO status.

73.    Defendant Randazzo served with Defendants Shamash, Sin, and Kanagaratnam (collectively the "CAC Defendants") on the Campus Affairs Committee that met in November 2016, and participated in the decision to deny Plaintiff Queens College Students for Life RSO status.

74.    Through their unbridled discretion to grant or deny RSO status to student groups pursuant to the RSO Policy, the CAC Defendants also control whether student groups are eligible to receive student activity fee funding under the Student Activity Fee Policy.

75.    Defendant Randazzo advised the other CAC Defendants on their decision to deny RSO status to Queens College Students for Life.

76.    Defendant Randazzo was responsible for administration of policies concerning the benefits and privileges available to student organizations and their access to forums for communication at Queens College, including the RSO Policy and the Student Activity Fee Policy,

and had the authority to enforce and recommend changes to those policies.

77. Defendant Randazzo did not explain to Plaintiffs the basis for the decision to deny RSO status to Queens College Students for Life under the RSO Policy and did not respond to requests from Miss Etienne concerning the basis for the decision.

78. Defendant Randazzo, in concert with the other CAC Defendants, denied Queens College Students for Life's application for RSO status, which decision discriminates against the group because of the content and viewpoint of its expression.

79. Defendant Randazzo is no longer employed at Queens College.

80. Defendant Randazzo is sued in his individual capacity.

81. Defendant Jessica Shamash is, and was at all times relevant to the Complaint, the Chairman of the Campus Affairs Committee at Queens College.

82. As a member of the CAC, Defendant Shamash has the authority granted her under the RSO Policy by the Board Defendants and Defendants Rodriguez, Rockman, Krinitz, and Randazzo to review student organization applications for RSO status and grant or deny those applications.

83. Defendant Shamash chaired the CAC that met in November 2016 and denied Plaintiff Queens College Students for Life RSO status.

84. Defendant Shamash is responsible for the administration and enforcement of the RSO Policy, granting the CAC Defendants, including herself, unbridled discretion to make decisions to grant or deny RSO status that are arbitrary and without justification and that result in viewpoint or content discrimination.

85. Defendant Shamash exercises unbridled discretion in enforcing the RSO Policy, and exercised unbridled discretion in denying RSO status to Queens College Students for Life.

86. Defendant Shamash and the CAC Defendants delayed the decision to deny Plaintiff Queens College Students for Life's application for RSO status, did not explain the decision, and then failed to respond to Miss Etienne's requests for an explanation for the basis of the denial.

87. Defendant Shamash, in concert with the other CAC Defendants, denied Queens College Students for Life's application for RSO status, which decision discriminates against the group

because of the content and viewpoint of its expression.

88.     Defendant Shamash is sued both in her individual and official capacities.

89.     Defendant Marco Sin is, and was at all times relevant to the Complaint, a member of the Campus Affairs Committee at Queens College.

90.     As a member of the Campus Affairs Committee, Defendant Sin has the authority granted him under the RSO Policy by the Board Defendants and Defendants Rodriguez, Rockman, Krinitz, Randazzo and Shamash to review student organization applications for RSO status and grant or deny those applications.

91.     Defendant Sin served on the Campus Affairs Committee that met in November 2016 and denied Plaintiff Queens College Students for Life RSO status.

92.      Defendant Sin is responsible for the administration and enforcement of the RSO Policy, exercising in conjunction with the other CAC Defendants unbridled discretion to make decisions to grant or deny RSO status that are arbitrary and without justification and that result in viewpoint or content discrimination.

93.     Defendant Sin exercised unbridled discretion in denying RSO status to Queens College Students for Life.

94.     Defendant Sin, in concert with the other CAC Defendants, denied Queens College Students for Life's application for RSO status, which decision discriminates against the group because of the content and viewpoint of its expression.

95.     Defendant Sin is sued both in his individual and official capacities.

96.     Defendant Raveen Kanagaratnam is, and was at all times relevant to the Complaint, a member of the Campus Affairs Committee at Queens College.

97.     As a member of the Campus Affairs Committee, Defendant Kanagaratnam has the authority granted him under the RSO Policy by the Board Defendants and Defendants Rodriguez, Rockman, Krinitz, Randazzo and Shamash to review student organization applications for RSO status and grant or deny those applications.

98.     Defendant Kanagaratnam served on the Campus Affairs Committee that met in

November 2016 and denied Plaintiff Queens College Students for Life RSO status.

99. Defendant Kanagaratnam is responsible for the administration and enforcement of the RSO Policy, exercising in conjunction with the other CAC Defendants unbridled discretion to make decisions to grant or deny RSO status that are arbitrary and without justification and that result in viewpoint or content discrimination.

100. Defendant Kanagaratnam, in concert with the other CAC Defendants, denied Queens College Students for Life's application for RSO status, which decision discriminates against the group because of the content and viewpoint of its expression.

101. Defendant Kanagaratnam is sued both in his individual and official capacities.

**FACTUAL BACKGROUND**

102. Queens College is a public university that is part of the City University of New York (CUNY) system, organized and existing under the laws of the State of New York and the City of New York, and receives funding from the State of New York and the City of New York for its operations.

103. Queens College is governed by a Board of Trustees, the Board Defendants.

104. The Board Defendants have promulgated Bylaws that govern the City University of New York, including Queens College. A true and correct copy of the City University of New York Board of Trustees Bylaws are attached as Exhibit 1.

**I. DEFENDANTS' REGISTERED STUDENT ORGANIZATION POLICY**

105. Queens College operates a forum for registered student organizations because it recognizes that organized student groups are a valuable part of the student educational environment, because, while they do not speak for the College and the College is not responsible for the speech of student groups, they further the College's educational mission by fostering an environment of the open exchange of ideas on campus.

106. Over one hundred student organizations are currently granted RSO status and participate in this forum at Queens College, including fraternities and sororities, sports teams, and student groups representing a number of political, religious, and other causes and views.

107. Defendants have approved for RSO status one or more student organizations that advocate for abortion rights and in opposition to the viewpoints of Queens College Students for Life.

108. Defendants maintain and enforce several policies that govern this RSO forum, and these will be collectively referenced in this Complaint as their Registered Student Organization Policy (RSO Policy).

109. As detailed in subsequent paragraphs, Defendants' RSO Policy consists of the following policies and practices:

    a. Article XV, Section 15.2(a-b) of the CUNY Board of Trustees Bylaws (Ex. 1);

    b. The *Student Development and Leadership Handbook* at 7–12, a true and correct copy of which is attached hereto as Exhibit 2; and

    c. The related policies and practices that govern the creation of a forum for registered student organizations at Queens College and the decision to grant or deny permission to student groups to participate in that forum.

**A. RSOs and Benefits of Being an RSO**

110. As detailed in subsequent paragraphs, Plaintiffs challenge, facially and as-applied, the provisions of Defendants' RSO Policy that authorizes the CAC Defendants to exercise unbridled discretion in granting or denying RSO status to student groups, allowing CAC Defendants to make decisions to grant or deny RSO status that are arbitrary and without justification and that result in discrimination against applicants on the basis of the content and viewpoint of their expression. *Bylaws*, art. XV § 15.2 (Ex. 1); Ex. 2 at 7–12.

111. The Board Defendants' Bylaws create the RSO forum and authorize the official registration of student organizations as follows:

Any group of students may form an organization, association, club or chapter by filing with the duly elected student government organization of the college or school at which they are enrolled or in attendance and with an officer to be designated by the chief student affairs officer of the college or school at which they are enrolled or in attendance (1) the name and purposes of the organization, association, club or chapter, (2) the names and addresses of its president and secretary or other officers corresponding in function to president and

secretary. Ex. 1 § 15.2(a).

112. The Bylaws further authorize each CUNY school or college student government to regulate student organizations and to delegate such authority. "Extra-curricular activities at each college or school shall be regulated by the duly elected student government organization." Ex. 1 § 15.2(b).

113. The Bylaws grant to the student government, "The power to charter or otherwise authorize teams (excluding intercollegiate athletics), publications, organizations, associations, clubs or chapters, and, when appropriate in the exercise of such regulatory power, the power to refuse, suspend or revoke any charter or other authorization for cause after hearing on notice." Ex. 1 § 15.2(b).

114. The Bylaws also authorize student government "[t]he power to delegate responsibility for the effective implementation of its regulatory functions hereunder to any officer or committee which it may appoint." Ex. 1 § 15.2(b).

115. The Office of Student Development and Leadership, under the authority of Defendant Krinitz, has produced the *Student Development and Leadership Handbook* (the "*Handbook*") that sets out the policies governing to student organizations at Queens College. *See* Ex. 2.

116. The *Handbook* includes the procedure for becoming an RSO under the RSO Policy, the benefits of registration under the RSO Policy, and the policies applicable to student organization funding under the Student Activity Fee Policy.

117. Registration of a student organization makes it eligible for a wide variety of privileges on campus, including:

1. Use of the College name in the title of the organization. (ex: Juggling Club at QC)
2. Use of College facilities.
3. Listed as part of the roster of official student organizations.
4. Use of College and student publications services.
5. Use of the services of the Office of Student Development & Leadership.
6. Ability to submit a budget request to the College Association.

Ex. 2 at 7.

118. In addition, RSO status "permits the [student] organization to request services from Queens College offices, use campus facilities and apply for funding." Ex. 2 at 10.

119. RSO status allows a student organization to apply for office space in the Student Union. Ex. 2 at 12.

120. RSOs are assigned a "category" by CAC. An advisor from the Office of Student Development and Leadership is assigned to each category and assists student organizations within their category with all organizational needs. Ex. 2 at 10.

121. Once a student group has RSO status, staff members from the Office of Student Development and Leadership assist it with planning meetings and events. Ex. 2 at 13.

122. Only RSOs may invite a "distinguished guest [or] dignitary[y] to Queens College. These invitees are defined as "any CUNY officer, a former Queens College faculty member or administrator, distinguished alumni, or any local or national public figure." Ex. 2 at 23.

**B. Procedure for Becoming an RSO and Defendants' Unbridled Discretion**

123. The *Handbook* sets out the required procedure for any group of students to apply for RSO status.

124. According to the *Handbook*, an "interest group" must consist of at least fourteen students to submit a "New Org packet" to the Office of Student Development and Leadership. Ex. 2 at 8.

125. After submitting the New Org packet, an interest group must then meet with the Campus Affairs Committee (CAC). Ex. 2 at 8.

126. According to The *Handbook*, "[t]he Campus Affairs Committee (CAC) is an appointed group of students affiliated with the Student Association, along with members of the Office of Student Leadership & Development professional staff." Ex. 2 at 8.

127. At a CAC meeting, Interest Groups are required to present their proposed organization to the committee for approval. Ex. 2, at 8.

128. Meetings between a proposed interest group and the CAC are not recorded and minutes are not taken or made publicly available.

129. After these meetings, the CAC votes to grant or deny a proposed interest group RSO

status.

130.  Neither the *Handbook*, nor any other policy, prescribes an appeal process for a group denied RSO status by the CAC.

131.  Neither the *Handbook,* nor any other published policy of Queens College, identifies any objective and exhaustive list of criteria to be applied by the CAC or any other officials in determining whether to approve a student organization's application for RSO status under the RSO Policy.

132.  Neither Defendants' *Handbook*, nor any other published policy of Queens College, requires the CAC to detail the reasons it denies RSO status to a proposed interest group.

133.  The *Handbook* highlights the CAC's power to deny RSO status to a proposed student group, and if it denies a group this status, states that CAC will simply provide recommendations for future applications. Ex. 2, at 8 ("PLEASE NOTE: Not all Interest Groups receive approval. If an Interest Group's proposal gets rejected, they will receive recommendations from CAC for future application procedures.")

134.  Neither the *Handbook* nor any other written policy identifies any process by which a student group whose application has been denied by CAC under the RSO Policy may appeal the decision to Defendant Krinitz or any other person.

135.  The CAC Defendants are empowered to monitor and enforce RSO policies and to recommend revisions to RSO Policies. Ex. 2 at 8–9.

## II.   DEFENDANTS' STUDENT ACTIVITY FEE POLICY

136.  As part of its student organization forum, Queens College operates a funding forum for RSOs, using a portion of the mandatory student activity fees that each student pays each semester to facilitate the expression and activities of RSOs.

137.  Pursuant to the Student Activity Fee Policy, Defendants have created a forum for student speech.

138.  Pursuant to the Student Activity Fee Policy, Defendants have authority over the specific allocations of student activity fees to student groups, and therefore have control over the content

and viewpoint of speech in the forum.

139. Defendants maintain and enforce several policies that govern this funding forum, and these will be collectively referenced in this Complaint as the Student Activity Fee Policy.

140. As detailed in subsequent paragraphs, Defendants' Student Activity Fee Policy consists of the following policies and practices:

a. Article XVI, §§ 16.1–16.5 and 16.11–16.12 of the CUNY bylaws, Ex. 1;

b. The Student Development and Leadership Handbook, Ex. 2 at 24–27;

c. The Queens College websites describing the mandatory student activity fee and its calculation, Ex. 3; and

d. The related policies and practices that require mandatory student activity fees to be paid by all students, that create a forum for student speech by allowing registered student organizations to apply for funding from those fees, and that authorize and create a system of unbridled discretion that permits their allocation in a content- and viewpoint-discriminatory basis.

141. As detailed in subsequent paragraphs, Plaintiffs challenge, facially and as-applied, the provisions of Defendants' Student Activity Fee Policy that do the following:

a. Make approval as an RSO a necessary qualification of eligibility for student activity funding where the RSO Policy affords unbridled discretion to deny this status based on the content or viewpoint of a group's speech. Ex. 2 at 24.

b. Afford Defendants and any other officials unbridled discretion to grant or deny student activity fee funding to RSOs. Ex. 1 §§ 16.1–16.5,16.11–16.12; Ex. 2 at 24–27.

c. Afford unbridled discretion by allowing Defendants to allocate student activity fee revenues based on their subjective assessment of whether an activity will "[e]nhance[] the college and university environment." Ex. 1 § 16.2.8.; Ex. 2 at 24.

d. Discriminate against newer viewpoints by limiting funding of new student groups. Ex. 2 at p. 27.

e. Afford unbridled discretion by allowing Defendants to allocate Student Activity Fee proceeds on the basis of an organization's "past performance," "potential for growth," the "reasonableness" and "merits" of its budget, and whether its programs "serve the needs of Queens College students, the Queens College community and the greater Queens community." Ex. 2 at 24.

f. Discriminate on the basis of content and viewpoint by prohibiting allocations for "partisan or nonpartisan political activities." Ex. 2 at 27.

g. Afford unbridled discretion by authorizing a student body referendum empowered to increase or decrease the budget for any RSO. Ex. 1 § 16.12.

h. Afford unbridled discretion by authorizing the Queens College Association Budget Committee and the Queens College Association Board to eliminate any budget item they subjectively believe are "inappropriate, improper or inequitable." Ex. 1 § 16.5; Ex. 2 at 25.

i. Require Plaintiffs to pay a mandatory student activity fee where proceeds from this mandatory student activity fee may be allocated through unbridled discretion in a content- and viewpoint-discriminatory manner. Ex. 1 § 16.1; Ex. 3.

A. **Assessment of a Mandatory Student Activity Fee**

142. The Bylaws authorize the assessment of a mandatory "Student Activity Fee" required of all students. Ex. 1 § 16.1.

143. Pursuant to the Bylaws, Queens College requires full-time undergraduate students to pay a Student Activity Fee of $162.40 per semester. A true and correct copy of the chart outlining Defendants' student activity fees for full-time undergraduate students is attached to this Complaint as Exhibit 3.

144. Pursuant to the Student Activity Fee Policy, payment of the Student Activity Fee is mandatory and cannot be refunded. Ex 3.

145. Only the $6 portion of the Student Activity Fee allocated to the New York Public Interest Research Group, "PIRG," may be refunded to any student who does not wish to contribute. Ex 3.

146. Over 21,000 undergraduate students currently attend Queens College during the 2016–2017 academic year.

147. During the 2016–2017 academic year, Queens College will collect over $6.8 million in mandatory student activity fees.

148. Miss Etienne and each member of Plaintiff Queens College Students for Life has paid or will pay in excess of $1,200 in mandatory Student Activity Fees in their eight semesters at the College. *See* Ex. 3.

149. Per the Bylaws, the "Student Activity Fee" consists of fees collected to support student government and other student activities. Ex. 1 § 16.1.

150. The Student Government Fee is a portion of the Student Activity Fee set by the Board and allocated by student government for student government itself and for use by student organizations. Ex. 1 § 16.3.

151. Student Activity Fees are collected from every student and held by the College for distribution by the student government under authority delegated to them by the Board Defendants. Ex. 1 § 16.1.

**B. Process for Allocating Mandatory Student Activity Fees**

152. These mandatory student fees may be used by the student government for both academic and nonacademic purposes, including funding RSOs. Ex. 1 § 16.2.

153. The College Association at each CUNY school is charged with the responsibility for allocating these Student Activity Fee proceeds. Ex. 1 § 16.5.

154. Expenditures for student groups from Student Activity Fees are by reimbursement. "All funds for the support of student activities are to be disbursed only in accordance with approved budgets and be based on written documentation." Ex. 1 § 16.6.

155. The *Handbook* details the policies and procedures applicable to allocating student activity fees to student organizations. Ex. 2 at 24–27.

156. Only RSOs may apply for or receive allocations of Student Activity Fee proceeds. Ex. 2 at 24.

157. The process begins with the RSO's submission of a "Budget Request Form." Ex. 2 at 25.

158. A staff member of the Office of Student Development and Leadership meets with representatives of the student group to discuss their budget request. Ex. 2 at 25. This staff member ensures that only RSOs are submitting budget requests.

159. The Queens College Association ("QCA") Budget Committee then reviews these RSO budget requests and holds hearings with student organizations to evaluate these requests. Ex. 2 at 25.

160. Upon information and belief, the QCA Budget Committee hearings are not recorded and minutes are not taken or made publicly available.

161. The Budget Committee then makes tentative allocations for student organization budgets. Ex. 2 at 25.

162. Upon information and belief, the deliberations of the Budget Committee at which these allocations are made are not recorded nor are minutes taken and made publicly available.

163. RSOs must then resubmit budget requests to the Budget Committee based on these tentative allocations. Ex. 2 at 25.

164. The Budget Committee then evaluates these resubmitted budget requests and prepares a full budget for review by the QCA Board of Directors. Ex. 2 at 25.

165. The QCA Board of Directors then evaluates the proposed budget and disapproves any allocation it believes does not conform to guidelines or that it deems to be "inappropriate, improper or inequitable." Ex. 2 at 25.

166. The QCA Board of Directors, per the Bylaws, is chaired by the President of the school or his designee. Other members of the QCA Board of Directors include two administrative members and an administrative alternate, two faculty members and two faculty alternates, and two independent directors, all of whom are appointed by the President. Six student members also serve on the QCA Board of Directors. Ex. 1 § 16.5.

167. Upon information and belief, the deliberations of the QCA Board of Directors concerning the allocations of Student Activity Fee funds to RSOs are not recorded and minutes are not taken

and made publicly available.

168.  Once a final budget has been approved by the QCA Board of Directors, the President of the College reviews the budget. Defendant Rodriguez may "disapprove any student activity fee, including student government fee, or auxiliary enterprise allocation or expenditure, which in his or her opinion contravenes the laws of the city, state, or nation or any bylaw or policy of the College or any policy, regulation, or order of the college." Ex. 1 § 16.11; Ex. 2 at 25.

169.  In addition to the regular process for allocating student fees described above, 10% of the student body may initiate a petition to earmark an amount of student activity fees to a specific RSO. Ex. 1 § 16.12

170.  The referendum is voted on by the student body during student elections, except where the President orders that it be scheduled for a student body vote at another time. Ex. 1 § 16.12

171.  The referendum may increase or decrease student activity fee funding for any RSO. Where such a referendum would require increasing or decreasing the total amount of the mandatory Student Activity Fee charged to students, the referendum results must be sent to the Board Defendants with the President's recommendation. Ex. 1 § 16.12

172.  Defendants have promulgated no objective standards to limit the discretion of the student body in petitioning for a referendum or voting on a referendum to allocate student activity fees to an RSO, nor could such objective standards be implemented in a student body referendum.

173.  Where the referendum would not change the total amount of the mandatory student activity fee charged to students the results are sent to the College Association for implementation. Ex. 1 § 16.12

**C.  Defendants' Unbridled Discretion in Allocation of Student Activity Fees**

174.  The Student Activity Fee Policy authorizes allocations for the following purposes:

1.  Extracurricular (Co-curricular) educational programs
2.  Cultural and social activities
3.  Student government
4.  Publications and media
5.  Community service programs
6.  Enhancement of the college and university environment

      7. Transportation, administration, and insurance for RSO's

      8. Stipends to student leaders

Ex. 2 at 24; Ex. 1 § 16.2.

175. No exclusive list of published standards exists to guide the discretion of the QCA Budget Committee, QCA, Defendant Rodriguez or any other Defendants in determining whether an RSO should receive funding and at what level.

176. The *Handbook* informs RSOs as follows about their budget requests:

When submitting budget requests, RSO's should realize that QCA reviews the past performance of the organization and its potential for growth. Organizations will be expected to justify significant increases over prior funding period allocations. In considering budget requests, the Budget Committee will review all budgets on the basis of their merits and the reasonableness of the requests. Organizations are encouraged to indicate programs, which serve the needs of Queens College students, the Queens College community and the greater Queens community.

Ex. 2 at 24.

177. Defendants have neither created nor published any exhaustive list of objective standards against which to evaluate the "past performance" of an organization or "its potential for growth."

178. Defendants have neither created nor published any exhaustive list of objective standards against which to evaluate the "merits and the reasonableness" of RSO budget requests.

179. Defendants have neither created nor published any exhaustive list of objective standards against which to evaluate whether programs "serve the needs of Queens College students, the Queens College community and the greater Queens community."

180. Defendants deny funding through student activity fees for "[a]ny partisan or nonpartisan political activities. . . ." Ex 2 at 24.

181. The Budget Committee provides less funding to new RSOs than existing RSOs and does not typically allocate more than $300 to student organizations in their first year. Ex. 2 at 26.

182. There is no prescribed right of appeal for RSOs denied funding or receiving a reduction in funding from their requested budget either from a decision of the QCA Budget Committee, the QCA Board of Directors, Defendant Rodriguez or a referendum by the student body.

183. Neither the meetings between the QCA Budget Committee and student organizations,

nor the deliberations of the Budget Committee or the QCA Board of Directors relevant to allocations of student activity fees are required to be recorded.

## III. BACKGROUND ON QUEENS COLLEGE STUDENTS FOR LIFE

184. Plaintiff Queens College Students for Life is a nonprofit, student-led expressive student group comprised of students attending Queens College.

185. Queens College Students for Life is affiliated with the national organization, Students for Life of America.

186. Miss Etienne is the President of Queens College Students for Life and a full-time student at Queens College.

187. Queens College Students for Life desires to be a registered student organization at Queens College and to fully participate in the forum for registered student organizations and the student activity fee funding forum.

188. Queens College Students for Life is founded on the view that all human life from the point of conception until natural death is sacred and has inherent dignity.

189. The purpose of Queens College Students for Life is to sustain and advocate peacefully for the inherent dignity of human life.

190. Queens College Students for Life intends to express its pro-life message on the College's campus through means including distributing flyers, displaying signs, holding peaceful demonstrations, hosting tables with information, inviting speakers to campus, and talking with fellow students about its pro-life views.

191. When engaging in these expressive activities, Queens College Students for Life and its members, including Miss Etienne, address political, religious, social, cultural, and moral issues, events, and ideas relating to its pro-life message.

192. Queens College Students for Life intends to engage in these expressive activities this year and continuing into the future.

## IV. DEFENDANTS' DENIAL OF REGISTERED STUDENT ORGANIZATION STATUS (AND THUS, ELIGIBILITY FOR FUNDING) TO QUEENS COLLEGE STUDENTS FOR LIFE

193. In August 2016, Miss Etienne contacted the Office for Student Development and Leadership expressing her desire to register Queens College Students for Life as an official registered student organization.

194. Etienne went to the Office of Student Development in August 2016 to pick up forms to apply for RSO status for Queens College Students for Life. She met Defendant Randazzo at that time.

195. At this first meeting, Defendant Randazzo was initially enthusiastic about helping Etienne to form a club. However, when she explained that her proposed group was a pro-life group his demeanor changed and he directed Etienne to the student organization forms outside the room.

196. Queens College Students for Life submitted a timely and complete application for registration, meeting all of the qualifications identified for RSO status under the RSO Policy.

197. Neither Defendants, nor any other official have advised Queens College Students for Life that its application was lacking in any respect.

198. On November 2, 2016 Defendant Shamash emailed Miss Etienne and other members of Queens College Students for Life, inviting them to present to the Campus Affairs Committee on November 7 in support of their application.

199. The Campus Affairs Committee met on November 7 to consider Queens College Students for Life's application for registered student organization status.

200. At that time, the CAC consisted of Defendants Shamash, Sin, Kanagaratnam, and Randazzo.

201. Miss Etienne and the other members of Queens College Students for Life used a PowerPoint presentation to outline the features of their organization, to explain how it would contribute to the campus community, and to support their application for RSO status. A true and correct copy of this PowerPoint presentation is attached to this Complaint as Exhibit 4.

202. Members of Queens College Students for Life explained to CAC that the mission of the

club would be to establish a pro-life culture on campus, educating their peers on the right to life and alternatives to abortion. Ex. 4

203. Members of Queens College Students for Life explained to CAC how they planned to accomplish their mission by distributing literature, assisting and advising those who have had an abortion or are considering abortion, conducting a Pregnant on Campus Initiative to provide practical assistance to pregnant and parenting students, and "being a pipeline" to a local pregnancy resource center that could provide further counseling and material resource to students considering abortion. Ex. 4.

204. During this presentation, Miss Etienne discussed the high rate of abortion among college-age women and the challenges that pregnant and parenting students face on campus, as part of explaining the reason behind Students for Life's efforts, expression, and activities. Ex. 4.

205. During the meeting, Defendant Shamash was dismissive of Etienne's discussion of the high rate of abortion among college-aged women, stopping her midsentence and telling her to just talk about the club.

206. The CAC abruptly ended the meeting in the middle of a short video Etienne showed about how Students for Life clubs have served pregnant students on other campuses.

207. The meeting of the CAC meeting to consider Queens College Students for Life's application was not recorded.

208. Upon information and belief, no minutes were taken or made publicly available of the CAC meeting to consider Queens College Students for Life's application for RSO status.

209. Neither the CAC nor any other Defendant or official of Queens College provided to Plaintiffs any objective list of criteria to be considered by the CAC with respect to the application for registered student organization status.

210. At least two other organizations also sought approval from the CAC and presented in support of their groups at the same meeting on November 7.

211. Those groups were immediately informed that they would be approved for RSO status.

212. The President of one of these two groups told Etienne that they had received their

approval twenty minutes after their meeting with the CAC Defendants on November 7.

213.  At the conclusion of Queens College Students for Life's presentation, Defendant Shamash told them that the CAC would inform them of their decision later that same day, November 7.

214.  The CAC did not inform Queens College Students for Life of its decision on November 7.

215.  Miss Etienne followed up by email to Defendant Shamash on November 8 asking if a decision had been made about their application for RSO Status, but received no response. A true and correct copy of the email from Etienne to Defendant Shamash is attached as Exhibit 5.

216.  Miss Etienne saw Defendant Shamash in the student government lounge on November 9 and asked her if a decision had been made.

217.  Defendant Shamash said that she would send Etienne the results immediately by email and copied Etienne's email address.

218.  Several hours later Defendant Shamash had still not emailed to inform her whether the application was approved.

219.  On November 10, Etienne emailed Defendant Krinitz to ask for her assistance in finding out whether the CAC would approve Queens College Students for Life's application for RSO status.

220.  Defendant Krinitz responded, saying, "I don't have any further information. I have cc'ed Severino [Randazzo] on this. He's been advising the committee. He will be back in the office on Tuesday." A copy of this November 10 email exchange between Defendant Krinitz and Miss Etienne is attached as Exhibit 6.

221.  Etienne again emailed Defendant Shamash on November 10 asking for the results of CAC's vote on the group's RSO status. This email went unanswered for 4 days until November 14, 2016. On that date, Defendant Shamash emailed to inform Etienne, "[w]e have decided to reject your club's approval." Ex. 6.

222.  Neither the CAC, nor any of the Defendants, provided any explanation for the basis for

the denial, nor offered any suggestions for points to address to enable Queens College Students for Life to become an RSO.

223.  No Defendant nor any other official advised Plaintiffs of any opportunity to appeal this decision.

224.  Miss Etienne responded to Defendant Shamash via email on November 14, copying Defendants Krinitz, Randazzo, Kanagaratnam and Sin asking for the reasons for the CAC Defendants' rejection of Queens College Students for Life so that the group could "better our approach for next semester if need be."  Ex. 6.

225.  None of the Defendants have responded to this email.

226.  No member of the CAC nor any other Defendant or official of Queens College has provided Etienne or Queens College Students for Life with any reason for the denial of the group's application for RSO status.

227.  As a result of the CAC Defendants' application of the RSO Policy to deny Queens College Students for Life RSO status, groups that advocate for abortion and against the views of Queens College are registered as RSOs, but Queens College Students for Life is not registered as an RSO.

**V.    THE EFFECT OF DEFENDANTS' POLICIES AND ACTIONS ON PLAINTIFFS' EXPRESSION**

228.  Because Queens College Students for Life has been denied RSO status it lacks access to the RSO forum and to the benefits and privileges that RSOs receive.

229.  Queens College Students for Life operates at a disadvantage to other registered student groups that have been granted RSO status and the benefits of registration, including student organization funding.

230.  Because Queens College Students for Life was denied RSO status, it is ineligible to receive student activity funding under the Student Activity Fee Policy.

231.  As a result of the Defendants' denial of its registered student organization status, Queens College Students for Life is unable to or restricted in its ability to accomplish its mission, including through each of the following:

a. Use college facilities for its meetings and to provide a space where pregnant and parenting students can come to receive information, receive practical material help and learn about alternatives to abortion. *See* Ex. 2 at 7.

b. Bring high profile speakers to campus to provide a pro-life and pro-woman perspective on abortion. See Ex. 2, at 7 (ineligibility to reserve campus facilities) and Ex. 2, at 23 (ineligibility to bring "distinguished guests and dignitaries" to campus).

c. Receive funding through Student Activity Fees to permit the group to bring speakers, hold events, provide material assistance to students, and promote their pro-life message. Ex. 2, at 24.

232. On September 14, 2016 Defendant Krinitz confirmed to Miss Etienne that because Queens College Students for Life had not been granted RSO status that it was ineligible for student activity funding. A copy of this email is attached as Exhibit 7.

233. As a result of its denial of RSO status, Queens College Students for Life will be forced to replace any student activity funding it would have received through other sources.

234. Were it afforded RSO status, Queens College Students for Life would avail itself of the benefits, privileges, channels of communication available to RSOs, including applying for student activity funding.

<u>**ALLEGATIONS OF LAW**</u>

235. All of the acts of Defendants, their officers, agents, employees, and servants, were executed and are continuing to be executed by the Defendants under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the State of New York.

236. The CAC Defendants act under color of state law when carrying out their duties and functions delegated to them by the other Defendants pursuant to the RSO Policy.

237. Defendants and The Queens College Association and the Queens College Association Budget Committee act under color of state law when carrying out their duties and functions delegated to them by the other Defendants pursuant to the Student Activity Fee Policy.

238. Defendants are not engaging in government speech in their decision to recognize or deny

recognition to student organizations pursuant to the RSO Policy or to permit an organization to receive student activity fee funding pursuant to the Student Activity Fee Policy.

239. Defendants knew or should have known that by subjecting Queens College Students for Life to a system of unbridled discretion in order to be recognized as a student organization that they violated the Plaintiffs' constitutional rights.

240. Defendants knew or should have known that by denying Queens College Students for Life RSO status without justification that it violated its constitutional rights.

241. Defendants knew or should have known that by excluding student organizations from receiving student activity fee funding through a system of unbridled discretion that they violated Plaintiffs' constitutional rights.

242. Defendants knew or should have known that by requiring Miss Etienne and the members of Queens College Students for Life to pay student activity fees for the support of groups whose views they do not wish to support while funding groups with those funds through a viewpoint discriminatory system that affords unbridled discretion to allocate student activity fees, Defendants violated Plaintiffs' constitutional rights.

243. The RSO Policy and Student Activity Fee Policy which Defendants applied to violate Plaintiffs' constitutional rights remain in full force and effect.

244. Plaintiffs are suffering irreparable harm from the RSO Policy, Student Activity Fee Policy, and the conduct of Defendants, which cannot be fully compensated by an award of money damages.

245. Plaintiffs have no adequate or speedy remedy at law to correct or redress the deprivation of their rights by Defendants.

246. Plaintiffs have suffered and will continue to suffer economic injury, including by being subject to mandatory student activity fees and being denied the opportunity to receive student activity fee funding.

247. Defendants have deprived, and continue to deprive, Plaintiffs of their clearly established rights under the United States Constitution, as set forth in the causes of action below.

248. Unless the conduct of Defendants is enjoined, Plaintiffs will continue to suffer irreparable injury.

**FIRST CAUSE OF ACTION**
**Violation of Plaintiff Queens College Students for Life's**
**First Amendment Right of Association**

249. Plaintiff Queens College Students for Life repeats and realleges each of the allegations contained in paragraphs 1-248 of this Complaint.

250. The First Amendment of the United States Constitution, incorporated and made applicable to Defendants through the Fourteenth Amendment, guarantees Plaintiff the right of association.

251. A College's denial of registration of a student organization without justification burdens and abridges the right of association.

252. A College's denial of a student group's access to meeting space and other benefits and privileges of registration, including the channels of communication available to other student groups on its campus, burdens and abridges the right of association.

253. Once a student group files an application for registered status with a College, the burden is upon the College to justify rejection of the application.

254. The denial of registered student organization status to a student organization is a form of prior restraint, placing a heavy burden on the College to justify its denial of registration.

255. The content or viewpoint of a student group's expression are invalid bases for denying a student group registration.

256. Defendants denied Queens College Students for Life's timely and complete application for RSO status.

257. Defendants provided no justification for the decision to deny Queens College Students for Life's application for RSO status and have refused to explain the decision when asked.

258. Defendants' denial of Queens College Students for Life's application for RSO status was content and viewpoint discrimination.

259. Because of Defendants' denial of Queens College Students for Life's application for RSO status, the group is ineligible to reserve meeting space for the organization and for its events and is excluded from channels of communication available to other student groups on campus.

260. Because of Defendants' denial of Queens College Students for Life's application for RSO status, the group is hindered in its ability to communicate with other students on campus and to remain a viable entity in the Queens College community.

261. Defendants have no legitimate or compelling reason for denying RSO status to Queens College Students for Life.

262. The RSO Policy does not require that Defendants provide any justification for the denial of RSO status.

263. The RSO Policy does not provide any right to appeal a decision to deny RSO status to a student group.

264. The RSO Policy affords unbridled discretion to grant or deny RSO status to Defendants.

265. The RSO Policy makes key benefits and privileges, including the ability to reserve meeting space, invite certain speakers, and use channels of communication available only to RSOs, denying those benefits and privileges to groups that are denied RSO status.

266. Accordingly, Defendants' RSO Policy, facially and as applied to Queens College Students for Life, violates the First Amendment right of association.

267. Because of Defendants' actions, Plaintiff Queens College Students for Life has suffered, and continues to suffer, economic injury and irreparable harm. It is entitled to an award of monetary damages and equitable relief.

268. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a declaration that Defendants violated their First Amendment right to freedom of association and an injunction against Defendants' policy and actions. Additionally, Plaintiff is entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**Violation of Plaintiff Queens College Students for Life's**
**First Amendment Right to Freedom of Speech**
**Unbridled Discretion and Viewpoint- and Content-Discrimination**

269. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–248 of this Complaint.

**RSO Policy**

270. The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits content and viewpoint discrimination by a public university in its decision to provide registered student organization status to a student group and to provide access to the benefits, privileges, and forums available to registered student organizations.

271. The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits viewpoint discrimination in a public forum created for student speech.

272. When a public university registers student organizations and makes benefits, privileges, and access to speech forums available to those registered student organizations, it creates a public forum for student speech and expression.

273. The government is not speaking its own message when it registers student organizations or extends to them certain benefits and privileges of that status.

274. The government's ability to restrict speech in a public forum is limited.

275. A public university may not apply content-based or viewpoint-based standards in registering student organizations.

276. The RSO Policy creates a public forum for student speech.

277. The RSO Policy affords Defendants and other College officials unbridled discretion to grant or deny registration to a student group, permitting discrimination against a student group because of the content and viewpoint of its speech.

278. The lack of objective criteria, factors, or standards for determining whether a group may

be an RSO and participate in that forum for student speech gives government officials unbridled discretion to exclude or prohibit speech based on its content or viewpoint in violation of the First Amendment.

279. The lack of a process to remove officials who violate viewpoint neutrality when deciding whether a student organization will be registered demonstrates that the government has unbridled discretion to govern the speech forum.

280. The lack of recorded meetings and written explanations of their decisions by officials charged with determining whether student organizations may be registered demonstrates that the government has unbridled discretion to govern the speech forum.

281. The lack of an appeal process in a student organization registration forum demonstrates that the government has unbridled discretion to govern the speech forums.

282. The lack of any explanation for Defendants' denial of RSO status to Queens College Students for Life and refusal to explain the decision when requested demonstrates that the government has unbridled discretion to govern the speech forum.

283. Defendants' RSO Policy confers unbridled discretion on Defendants or other officials charged with determining whether a student group will be granted RSO status to suppress and/or discriminate against disfavored speech because of its content or viewpoints.

284. Defendants' RSO Policy provides no process through which an official may be removed for violating the constitutional prohibition against viewpoint discrimination.

285. Defendants' RSO Policy does not provide that all of its meetings and deliberations be open to the public, recorded, or that minutes be publicly available.

286. Defendants' RSO Policy does not provide student organizations with the ability to appeal decisions to deny a group registered status.

287. Defendants' RSO Policy does not require that student groups be provided a rationale for the decision to deny the group RSO status.

288. Defendants' denial of registered student organization status to Queens College Students for Life and its exclusion from receiving student activity funding served no legitimate purpose.

289. Accordingly, Defendants' RSO Policy, and their enforcement of this policy against Plaintiffs violated Plaintiffs' rights to freedom of speech guaranteed by the First Amendment.

290. Defendants' denial of Queens College Students for Life's application for registered student organization status was viewpoint and content discriminatory.

291. Defendants' denial of Queens College Students for Life's application for RSO status fails to satisfy strict scrutiny because it is not narrowly tailored to promote a compelling government interest.

292. Defendants' denial of Queens College Students for Life's application for registered student organization status was unreasonable.

**Student Activity Fee Policy**

293. The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits a public university from permitting viewpoint discriminatory allocation of student activity funding.

294. When a public university collects mandatory student fees and allows registered student organizations to apply for funding from those student fees, it creates a public forum for student speech and expression.

295. When the government allocates funds collected through mandatory student activity fees to student organizations and those student organizations use those funds for their own expressive activities, the government is not speaking its own message.

296. A student organization's use of funding obtained through mandatory student fees to promote its own views is a form of protected speech.

297. A public university may not apply content-based or viewpoint-based standards in allocating student organization funding derived from mandatory student fees.

298. The Student Activity Fee Policy creates a public forum for student speech.

299. Because the RSO Policy affords Defendants and other College officials unbridled discretion to grant or deny registration to a student group, permitting discrimination against a student group because of the content and viewpoint of its speech, and because the Student Activity

Fee Policy limits eligibility to RSOs, the Student Activity Fee affords unbridled discretion to exclude student groups from receipt of funding based on the content and viewpoint of their speech.

300. The lack of objective criteria, factors, or standards for determining whether an RSO may receive funding under the Student Activity Fee Policy and at what level gives officials unbridled discretion to discriminate against speech based on its content or viewpoint in violation of the First Amendment.

301. The lack of a process to remove officials who violate content and viewpoint neutrality when deciding whether an RSO will receive Student Activity Fee funding and at what level demonstrates that the government has unbridled discretion to govern the speech forum.

302. The lack of recorded meetings and written explanations of their decisions by officials charged with determining whether student organizations may receive Student Activity Fee funding demonstrates that the government has unbridled discretion to govern the speech forum.

303. The lack of an appeal process in a forum for Student Activity Fee funding demonstrates that the government has unbridled discretion to govern the speech forum.

304. Authorization of a student body referendum to increase or decrease Student Activity Fee funding for any RSO demonstrates that the government has provided unbridled discretion to govern the speech forum.

305. Defendants' Student Activity Fee Policy confers unbridled discretion on Defendants or other officials charged with determining whether a student group will receive Student Activity Fee funding to suppress and/or discriminate against disfavored speech because of its content or viewpoints.

306. Defendants' Student Activity Fee Policy provides no process through which an official may be removed for violating the constitutional prohibition against content or viewpoint discrimination.

307. Defendants' Student Activity Fee Policy does not provide that all of its meetings and deliberations be open to the public, recorded, or that minutes be publicly available.

308. Defendants' Student Activity Fee Policy does not provide student organizations with the

ability to appeal decisions to deny a group RSO status.

309. Defendants' Student Activity Fee Policy does not require that student groups be provided a rationale for the decision to deny or reduce their budget request.

310. The Student Activity Fee Policy excludes certain "political" expression from receiving student activity funding, including "non-partisan political activities."

311. The Student Activity Fee Policy permits Defendants and other officials to evaluate the "past performance" of an organization, "its potential for growth," the "merits and the reasonableness" of its request, and whether a group's programs will "serve the needs of Queens College students, the Queens College community and the greater Queens community" while providing no objective criteria to bridle discretion in evaluating these factors.

312. The Student Activity Fee Policy requires the QCA Budget Committee, the QCA Board of Directors, and Defendant Rodriguez to veto any allocation deemed "inappropriate, improper or inequitable," but provides no objective definition of those terms or any objective criteria to bridle discretion in evaluating these factors.

313. Defendants' exclusion of Queens College Students for Life from the opportunity to apply for student activity fee funding is viewpoint and content discriminatory.

314. Defendants' Student Activity Fee Policy and the exclusion of Queens College Students for Life from the opportunity to apply for Student Activity Fee funding fail to satisfy strict scrutiny because it is not narrowly tailored to promote a compelling government interest.

315. Defendants' Student Activity Fee Policy and the exclusion of Queens College Students for Life from the opportunity to apply for Student Activity Fee funding is content and viewpoint discriminatory and unreasonable.

316. The lack of objective criteria, factors, or standards for determining whether a group may receive Student Activity Fee funding and at what level gives government officials unbridled discretion to exclude, prohibit, or disadvantage speech based on its content or viewpoint in violation of the First Amendment.

317. Because of Defendants' actions, Plaintiff has suffered, and continues to suffer,

economic injury and irreparable harm. Plaintiff is entitled to an award of monetary damages and equitable relief.

318. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a declaration that Defendants violated its First Amendment right to freedom of speech and an injunction against Defendants' policy and actions. Additionally, Plaintiff is entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including its reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
**Violation of Plaintiffs' First Amendment Right to Freedom of Speech**
**Compelled Speech**

319. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1-248 of this Complaint.

320. The First Amendment's Freedom of Speech Clause prohibits the government from compelling citizens to express or support a message not of their own choosing.

321. The First Amendment's Freedom of Speech Clause prohibits public universities from collecting a mandatory student fee that is used to fund student organization speech, if that mandatory student fee is not allocated in a viewpoint neutral manner.

322. Through the Student Activity Fee Policy, Defendants compel Plaintiff Norvilia Etienne, the other members of Plaintiff Queens College Students for Life, and all University students to pay a mandatory student fee that is used in part to fund student organization speech on campus in a content and viewpoint discriminatory manner.

323. Because the RSO Policy affords Defendants and other College officials unbridled discretion to grant or deny registration to a student group, permitting discrimination against a student group because of the content and viewpoint of its speech, and because the Student Activity Fee Policy limits eligibility to RSOs, the Student Activity Fee affords unbridled discretion to exclude student groups from receipt of funding based on the content and viewpoint of their speech.

324. The lack of objective criteria, factors, or standards for determining whether an RSO may receive funding under the Student Activity Fee Policy and at what level gives officials unbridled

discretion to discriminate against speech based on its content or viewpoint in violation of the First Amendment.

325. The lack of a process to remove officials who violate content and viewpoint neutrality when deciding whether an RSO will receive Student Activity Fee funding and at what level demonstrates that the government has unbridled discretion to govern the speech forum.

326. The lack of recorded meetings and written explanations of their decisions by officials charged with determining whether student organizations may receive Student Activity Fee funding demonstrates that the government has unbridled discretion to govern the speech forum.

327. The lack of an appeal process in a forum for Student Activity Fee funding demonstrates that the government has unbridled discretion to govern the speech forum.

328. Authorization of a student body referendum to increase or decrease Student Activity Fee funding for any RSO demonstrates that the government has provided unbridled discretion to govern the speech forum.

329. Defendants' Student Activity Fee Policy confers unbridled discretion on Defendants or other officials charged with determining whether a student group will receive Student Activity Fee funding to suppress and/or discriminate against disfavored speech because of its content or viewpoints.

330. Defendants' Student Activity Fee Policy provides no process through which an official may be removed for violating the constitutional prohibition against content or viewpoint discrimination.

331. Defendants' Student Activity Fee Policy does not provide that all of its meetings and deliberations be open to the public, recorded, or that minutes be publicly available.

332. Defendants' Student Activity Fee Policy does not provide student organizations with the ability to appeal decisions to deny a group RSO status.

333. Defendants' Student Activity Fee Policy does not require that student groups be provided a rationale for the decision to deny or reduce their budget request.

334. The Student Activity Fee Policy excludes certain "political" expression from receiving

student activity funding, including "non-partisan political activities."

335. Defendants exclude Queens College Students for Life from the opportunity to apply for student activity fee funding because of the content and viewpoint of its speech.

336. Defendants' Student Activity Fee Policy and the exclusion of Queens College Students for Life from the opportunity to apply for Student Activity Fee funding fail to satisfy strict scrutiny because it is not narrowly tailored to promote a compelling government interest.

337. Defendants' Student Activity Fee Policy and the exclusion of Queens College Students for Life from the opportunity to apply for Student Activity Fee funding is content and viewpoint discriminatory and unreasonable.

338. The lack of objective criteria, factors, or standards for determining whether a group may receive Student Activity Fee funding and at what level gives government officials unbridled discretion to exclude, prohibit, or disadvantage speech based on its content or viewpoint in violation of the First Amendment.

339. Defendants' Student Activity Fee Policy compels Miss Etienne and the student members of Plaintiff Queens College Students for Life to fund and support speech and viewpoints with which they disagree and which they find offensive and objectionable.

340. Pursuant to the Student Activity Fee Policy and the RSO Policy, Defendants engage in content- and viewpoint-based discrimination by denying registered student organization status to Queens College Students for Life and by funding expressive activities of other student organizations at the College, but not Plaintiffs because of the content and viewpoint of their expression.

341. Defendants apply the Student Activity Fee Policy and the RSO Policy in a discriminatory manner, allowing other student organizations to receive student activity fee funding, allowing other groups to share their views on the same or similar topics that Plaintiffs wish to address while denying Queens College Students for Life the opportunity to receive student activity funding for their expression.

342. The Student Activity Fee Policy and the RSO Policy prohibit certain political viewpoints

from receiving any allocation of funding, including "non-partisan political activities."

343. Accordingly, Defendants' Student Activity Fee Policy and the RSO Policy violates Plaintiffs' right to freedom of speech guaranteed by the First Amendment.

344. Because of Defendants' actions, Plaintiffs have suffered, and continue to suffer, economic injury and irreparable harm. They are entitled to an award of monetary damages and equitable relief.

345. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to a declaration that Defendants violated their First Amendment right to freedom of speech and an injunction against Defendants' policy and actions. Additionally, Plaintiffs are entitled to damages in an amount to be determined by the evidence and this Court for student activity fees paid and the reasonable costs of this lawsuit, including their reasonable attorneys' fees.

**FOURTH CAUSE OF ACTION**
**Violation of Plaintiff Queens College Students for Life's**
**Fourteenth Amendment Right to Due Process of Law**

346. Plaintiff Queens College Students for Life repeats and realleges each of the allegations contained in paragraphs 1-248 of this Complaint.

347. The Fourteenth Amendment to the United States Constitution guarantees Plaintiff the right to due process of law and prohibits Defendants from promulgating and employing vague standards that allow for content and viewpoint discrimination in determining whether to approve Queens College Students for Life's application for RSO status and to provide it Student Activity Fee funding.

348. The government may not regulate speech based on policies that permit arbitrary, discriminatory, and overzealous enforcement.

349. The government may not regulate speech based on policies that cause persons of common intelligence to guess at their meaning and differ as to their application.

350. The government may not regulate speech based on policies that do not provide persons of common intelligence fair warning as to what speech is permitted and what speech is prohibited.

351. The RSO Policy contains no criteria to guide decision makers in determining whether to grant or deny a student group RSO status.

352. The RSO Policy does not require that student groups be informed of the basis for the decision to deny them RSO status.

353. The RSO Policy does not provide for any right of appeal of a student group denied RSO status.

354. The RSO Policy does not require that meetings where decisions about registered status of a prospective RSO are made be recorded or minutes taken and made publicly available.

355. The RSO Policy does not provide for the removal of any members of CAC or other decisionmakers who have abused their authority or violated the Constitutional rights of a student group.

356. The Student Activity Fee Policy provides no process through which an official may be removed for violating the constitutional prohibition against content or viewpoint discrimination.

357. The Student Activity Fee Policy does not provide that all of its meetings and deliberations be open to the public, recorded, or that minutes be publicly available.

358. The Student Activity Fee Policy does not provide student organizations with the ability to appeal decisions to deny or reduce a group's budget request.

359. The Student Activity Fee Policy does not require that student groups be provided a rationale for the decision to deny or reduce their budget request.

360. The Student Activity Fee Policy excludes certain "political" expression from receiving student activity funding, including "non-partisan political activities," without defining these terms.

361. Defendants' RSO Policy and Student Activity Fee Policy are impermissibly vague and ambiguous and are thus incapable of providing meaningful guidance to Defendants or allowing Plaintiff to conform its conduct.

362. The RSO Policy is impermissibly vague and ambiguous because it broadly authorizes CAC Defendants to deny registered student organization status to groups for any reason or no reason at all, providing no objective criteria upon which to make this determination and no

opportunity for Plaintiffs to conform their actions so as to participate in the forum.

363. The Student Activity Fee Policy is impermissibly vague and ambiguous because it excludes student organizations from receiving an allocation of student activity fees because they have not been registered pursuant to the vague and ambiguous RSO Policy.

364. The Student Activity Fee Policy is impermissibly vague and ambiguous because it permits Defendants and other officials to prohibit funding for activities deemed "political" including "non-partisan political activities" while providing no objective definitions of these terms.

365. The Student Activity Fee Policy is impermissibly vague and ambiguous because it permits Defendants and other officials to evaluate the "past performance" of an organization, "its potential for growth," the "merits and the reasonableness" of its request, and whether a group's programs will "serve the needs of Queens College students, the Queens College community and the greater Queens community" while providing no objective definitions of these terms.

366. The Student Activity Fee Policy is impermissibly vague and ambiguous because it permits the QCA Budget Committee, the QCA Board of Directors, and Defendant Rodriguez to veto any allocation deemed "inappropriate, improper or inequitable," but provides no objective definition of those terms.

367. Because of Defendants' actions pursuant to the RSO Policy and Student Activity Fee Policy, Plaintiff Queens College Students for Life has suffered, and continues to suffer, economic injury and irreparable harm. Plaintiff is entitled to an award of monetary damages and equitable relief.

368. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a declaration that Defendants violated its Fourteenth Amendment right to due process of law and an injunction against Defendants' RSO Policy and Student Activity Fee Policy. Additionally, Plaintiff is entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including its reasonable attorneys' fees.

**Violation of Plaintiff Queens College Students for Life's
Fourteenth Amendment Right to Equal Protection of the Law**

369.  Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-248 of this Complaint.

370.  The Fourteenth Amendment to the United States Constitution guarantees Plaintiff the equal protection of the laws, which prohibits Defendants from treating Plaintiff differently than similarly situated student organizations.

371.  The government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

372.  Plaintiff Queens College Students for Life is similarly situated to other student organizations seeking registered student organization status and to other registered student organizations at the College, including RSOs that advocate for abortion rights.

373.  Pursuant to the RSO Policy and Student Activity Fee Policy, Defendants granted registered student organization status and grant mandatory student fee funding to other similar student organizations, but deny the same to Plaintiff.

374.  Pursuant to the RSO Policy and the Student Activity Fee Policy, Defendants grant registered status and its benefits, privileges and access to speech forums, and do and will grant mandatory student fee funding to other students organizations advocating viewpoints on political, ideological, and social issues, but denied RSO status and the opportunity to seek student activity funding to Plaintiff because of its views on those issues.

375.  Pursuant to the RSO Policy and the Student Activity Funding Policy, Defendants treated Plaintiff disparately when compared to similarly situated student organizations by denying Plaintiff RSO status and the opportunity to apply for student activity funding.

376.  On the same date that the CAC heard Plaintiff Queens College Students for Life's presentation in support of its application for registered student organization status, it immediately

approved the applications of at least two other organizations but delayed a response to Queens College Students for Life for one week before denying its application without explanation.

377. Defendants have failed to respond to Miss Etienne's repeated requests for an explanation of the denial of RSO status for Queens College Students for Life.

378. Defendants' RSO Policy and Student Activity Fee Policy violate various fundamental rights of Plaintiff, including freedom of association, freedom of speech and due process of law.

379. When government regulations, like Defendants' RSO Policy and Student Activity Fee Policy, infringe on fundamental rights, discriminatory intent is presumed.

380. Defendants' RSO Policy and Student Activity Fee Policy have been applied to discriminate intentionally against Plaintiff's rights to freedom of association, freedom of speech, and due process of law.

381. Defendants lack a rational or compelling state interest for their disparate treatment of Plaintiff.

382. Defendants' RSO Policy and Student Activity Fee Policy, and their application to Plaintiff are not narrowly tailored as applied to Plaintiff because Plaintiff's speech does not implicate any legitimate interest of Defendants.

383. Defendants have applied the RSO Policy and the Student Activity Fee Policy to Plaintiff in a discriminatory and unequal manner, allowing other student organizations to receive RSO status and its benefits, privileges and speech forum access and to receive funding to speak on topics while denying those same opportunities to Plaintiff, in violation of Plaintiff's right to equal protection of the laws under the Fourteenth Amendment.

384. Because of Defendants' actions pursuant to the RSO Policy and the Student Activity Fee Policy, Plaintiff has suffered, and continues to suffer, economic injury and irreparable harm. It is entitled to an award of monetary damages and equitable relief.

385. Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a declaration that Defendants violated its Fourteenth Amendment right to equal protection of law and an injunction against Defendants' RSO Policy and Student Activity Fee Policy. Additionally, Plaintiff is entitled

to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including its reasonable attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

A. A declaratory judgment that the Defendants' RSO Policy, facially and as-applied, violates Queens College Students for Life's rights under the First and Fourteenth Amendment;

B. A declaratory judgment that the Defendants' Student Activity Fee Policy, facially and as-applied, violates Plaintiffs' rights under the First and Fourteenth Amendment;

C. A preliminary and permanent injunction prohibiting the Defendants, their agents, officials, servants, employees, and any other persons acting in their behalf from enforcing the RSO Policy and the Student Activity Fee Policy challenged in this Complaint;

D. A preliminary and permanent injunction prohibiting the Defendants, their agents, officials, servants, employees, and any other persons acting in their behalf from denying Plaintiff Queens College Students for Life status as a registered student organization or any of the benefits, privileges or access to speech forums pertaining to RSO status;

E. Actual compensatory damages for infringing Plaintiff's exercise of its First and Fourteenth Amendment rights;

F. Actual compensatory damages in the amount of mandatory student fees paid by each of Plaintiff Queens College Students for Life's student members, including Miss Etienne, that was collected pursuant to a content- and viewpoint-based policy that infringed Plaintiffs' First Amendment rights;

G. Nominal damages for the violation of Plaintiffs' First and Fourteenth Amendment rights;

H. Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

I. All other further relief to which Plaintiffs may be entitled.

Respectfully submitted this 25th day of January, 2017,

/s/ Joseph A. Ruta
Joseph A. Ruta (JR0010)
Ruta Soulios & Stratis, LLP
370 Lexington Avenue, 24th Floor
New York, NY 10017
(212) 997-4500
(212) 768-0649 (facsimile)
jruta@lawnynj.com

Michael Casey Mattox (D.C. Bar No. 1033672)
Jonathan Caleb Dalton (D.C. Bar No. 1033291)
ALLIANCE DEFENDING FREEDOM
440 1st Street NW, Suite 600
Washington, D.C. 20001
(202) 393-8690
(202) 347-3622 (facsimile)
cmattox@ADFlegal.org
cdalton@ADFlegal.org

Travis C. Barham (Georgia Bar No. 753251)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., Suite D-1100
Lawrenceville, Georgia 30043
(770) 339–0774
(770) 339–6744 (facsimile)
tbarham@ADFlegal.org

Attorneys for Plaintiffs

## <u>VERIFICATION OF COMPLAINT</u>

I, Norvilia Etienne, a citizen of the United States and a resident of the State of New York, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged are true and correct.

Executed this 18th day of January, 2017.


_____
Norvilia Etienne